UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------- X

UNITED STATES OF AMERICA,

                                   16-cr-342-CBA

            -against-

MICHAEL RIZZI,

                      Defendant.

---------------------------------------------------------------------- X

## SENTENCING MEMORANDUM FOR
## DEFENDANT MICHAEL RIZZI

**A.**     **Introduction**

      Defendant Michael Rizzi places before the Court the following issues relating to his appropriate sentence pursuant to Fed. R. Crim. P. 32 and in accordance with 18 U.S.C. § 3553(a) and § 6A1.2 of the United States Sentencing Guidelines ("USSG").

      On October 5, 2016, Michael Rizzi pled guilty to Count Two of a two-count indictment that charged him with Conspiracy to Commit Money Laundering (18 U.S.C. § 1956(h)).  The U.S. Probation Officer calculated Mr. Rizzi's guidelines as a level 18 on the money laundering conspiracy that involved financial transactions traceable to BJM, the escort business owned and operated by Mr. Rizzi.  The calculation includes a two level upward adjustment pursuant to USSG § 3B1.1(c) for Mr. Rizzi's role in directing the activities of less than five participants. (PSR, ¶ 22).

      The Probation Officer also applied five additional units, resulting in four additional levels, under the grouping rules for closely related counts pursuant to USSG § 2G1.1(d)(1) which provides that "[i]f the offense involved more than one victim, Chapter Three, Part D, (Multiple

Counts) shall be applied as if the promoting of a commercial sex act or prohibited sexual conduct in respect to each victim had been contained in a separate count of conviction." Under § 3D1.4, Mr. Rizzi's offense level was increased by four levels for additional victims, resulting in a combined offense level of 22.  With a three level reduction for acceptance of responsibility and a criminal history category II, the Probation Officer calculated a total offense level of 19 with an advisory guidelines range of 33 to 44 months.

Mr. Rizzi objects to the upward adjustment for role in the offense.  He also objects to the Probation Officer's determination that he should be afforded three criminal history points resulting in a criminal history category of II.  Finally, he objects to the four level upward adjustment for additional victims because Mr. Rizzi believes that the guideline fails to distinguish between his conduct and the conduct of other defendants who threaten or coerce their victims to engage in prostitution.  As the Honorable Edward R. Korman, U.S.D.J. found when he sentenced Marc Schulman – " The Court departs because [  ] the fact that the deft merely provided to "women of the night" who were voluntarily pursuing their occupation transportation [  ]" – the alleged "victims" were nothing more than co-conspirators in the licit and illicit operations of the escort and prostitution business.  To rule otherwise would make a mockery of the facts of this case.

### The Two Level Upward Adjustment is Based on Conduct that Merges With the Promotion of a Commercial Sex Act and is Precluded under *United States v. Santos*

The Probation Officer determined that Mr. Rizzi should receive a two level upward adjustment pursuant to USSG § 3B1.1(c) for being an organizer and leader of money laundering activity that involved less than five participants.  The Probation Officer states that "[s]pecifically, the defendant supervised the activities of the bookers, and he personally received the bulk of the profits." (PSR ¶ 14).  The upward adjustment is inappropriate because Mr. Rizzi's role in

2

supervising "the bookers" suffers from a merger problem in that the activities of those individuals was a necessary part of paying the essential expenses of the underlying offense. Per *United States v. Santos*, 554 U.S. 507 (2009), this Court must determine that Mr. Rizzi supervised no one with respect to the actual offense of Money Laundering and therefore the two-level upward adjustment should be denied.

In *United States v. Santos*, 554 U.S. 507 (2009), a plurality of the Supreme Court held that the term "proceeds" in the provision of the money-laundering statute which criminalizes transactions to promote criminal activity refers to "profits" rather than "gross receipts" at least as applied to illegal gambling activities. The Court held that "[a]llowing the Government to treat the mere payment of an illegal gambling business' operating expenses as a separate offense is in practical effect tantamount to double jeopardy." *Id.* at 508. The Court went on to explain that:

> [i]f "proceeds" meant "receipts," nearly every violation of the illegal-lottery statute would also be a violation of the money laundering statute, because paying a winning bettor is a transaction involving receipts that the defendant intends to promote the carrying on of the lottery. Since few lotteries, if any, will not pay their winners, the statute criminalizing illegal lotteries, (citation omitted), would "merge" with the money-laundering statute."

*Id.* at 515-16. The Court held that interpreting "proceeds" to mean "net profits" not "gross receipts" eliminates the merger problem, explaining that "[a] criminal who enters into a transaction paying the expenses of his illegal activity cannot possibly violate the money-laundering statute, because by definition profits consists of what remains after expenses are paid. Defraying an activity's costs with its receipts will not be covered." *Id.*

Looking past illegal gambling, Justice Scalia reasoned that:

> For a host or predicate crimes, merger would depend on the manner and timing of payment for the expenses associated with the commission of the crime. Few crimes are entirely free from costs, and costs are not always paid in advance. Anyone who pays for the costs of a crime with its proceeds – for example, the felon who uses the stolen money to pay for the rented getaway car – would violate the money-laundering statute. And any

3

wealth-acquiring crime with multiple participants would become money laundering when the initial recipient of the wealth gives his confederates their shares. Generally speaking, any specified unlawful activity, an episode of which includes transactions which are not elements of the offense and in which a participant passes receipts on to someone else, would merge with the money laundering.

*Id.*

A hypothetical explanation should assist this Court in determining that the adjustment is inappropriate to Mr. Rizzi. Consider for instance, a person who engaged in the unlawful distribution of narcotics and collected one million dollars in cash profits from that criminal activity. If this person were to engage the services of two of his friends to take those cash profits, place that money in the bank and purchase real estate that ultimately would benefit the narcotics trafficker, he would have been responsible for directing the activities of two participants in his money laundering offense and the two level upward adjustment should be appropriate to any proposed money laundering conviction. However, assuming that the narcotics offense is not at issue in sentencing, the person's direction of any of the activities of any of the members of the narcotics trafficking organization would not subject him to a two level upward adjustment because those activities were not directed towards the offense of money laundering but rather they were part of the specified unlawful activity for which the money laundering conviction rested.

In Mr. Rizzi's case, the Government and Probation are not arguing that he should receive a Role Adjustment based upon his alleged direction or supervision of the escorts in his operation. This is so because the offense of "promotion of a commercial sex act" would not be completed without the actual escort engaging in the commercial act. It follows then, that Mr. Rizzi's direction or control of "the bookers" – who are alleged to have operated as "an individual who set up appointments and dispatched the prostitutes" (PSR ¶ 9) – would equally be so intertwined

with the offense of promotion, such that a two level upward adjustment should not be imposed because they were basically "essential expenses" of the underlying offense.

> **The Addition of Four Levels Under § 2G1.1(d)(1) for Victims is Inappropriate Because the Escorts were not Victims, the plea agreement did not Contemplate the Additional Levels, and the Conduct Cited by the Probation Officer Is <u>Not</u> Attributable to Mr. Rizzi**

USSG § 2G1.1(d)(1) provides that "[i]f the offense involved more than one victim, Chapter Three, Part D, (Multiple Counts) shall be applied as if the promoting of a commercial sex act or prohibited sexual conduct in respect to each victim had been contained in a separate count of conviction."  Application Note 5 to § 2G1.1(d) provides:

> Special Instructions at Subsection (d)(1). – For the purposes of Chapter Three, Part D (Multiple Counts), each person transported, persuaded, induced, enticed, or coerced to engage in, or travel to engage in, a commercial sex act or prohibited sexual conduct is to be treated as a separate victim.  Consequently, multiple counts involving more than one victim are not to be grouped together under § 3D1.2 (Groups of Closely Related Counts). In addition, subsection (d)(1) directs that if the relevant conduct of an offense of conviction includes the promoting of a commercial sex act or prohibited sexual conduct in respect to more than one victim, whether specifically cited in the count of conviction, each such victim shall be treated as if contained in a separate count of conviction.

Under the grouping rules in § 3D1.4, the Probation Officer increased Mr. Rizzi's offense level by four levels because there were 3 ½ to 5 additional units based upon the allegation that the "Government advised that at any one time, Pure Platinum Models was promoting the services of at least 5 escorts/prostitutes."  (PSR ¶ 14).  Mr. Rizzi objects to this adjustment because the escorts were not victims, the plea agreement did not contemplate the additional levels, and the conduct cited by the Probation Officer as the basis for the adjustment is not properly attributed to Mr. Rizzi.

First, the Probation Officer's citation to the Government's allegations concerning "Pure Platinum Models" must be dismissed by this Court when it considers the appropriate sentence for Mr. Rizzi.  This is because Mr. Rizzi is not responsible for the activities of Pure Platinum

Models.  That is a business organization that was created by and exclusively controlled by Marc Schulman.  Neither the Indictment nor the Complaint in this action attribute the activities of Pure Platinum Models with Mr. Rizzi.  As properly referenced in the PSR, March Schuman was sentenced for money laundering by the Honorable Edward R. Korman to one year and one day on October 9, 2015.  This conviction was based upon Schulman's role in the organization of Pure Platinum Models.  Mr. Rizzi, however, is solely responsible for the activities carried out under the business of BJM and/or Manhattan Stakes Entertainment.  Any reference to Rizzi's connection to Pure Platinum Models must be rejected by this Court.

Second, the parties entered into a written plea agreement after lengthy discussions and negotiations.  The Government in its guidelines calculation maintains that a five level enhancement is appropriate pursuant to USSG § 2S1.1(d)(1) and 3D1.4 because the offense involved five or more victims.  Notably, the Government did not attempt to make the same argument that the Probation Officer does, despite the fact that this same sentencing scenario played out in Mr. Schulman's case where the Government and the Defendant agreed to dispute the 3D1.4 "victims" and the Probation Officer interjected that the proper consideration would be the Grouping Rules of 2G1.1D.

The plea agreement specifically states that "the defendant does not stipulate to the application of the five-point enhancement under U.S.S.G. §2S1.1(d)(1); 3D1.4, and does not stipulate to the additional two-point leadership enhancement under § 3B1.1(c)."  Therefore, the Probation Officer has taken a separate and disparate view of the evidence when crafting the PSR.  Although this is the right of the Probation Officer and indeed, of the Court, the Probation Officer's interpretation of the offense of conviction and the additional levels to be added for

alleged victims materially alters the offense of conviction such that this procedural due process should concern this Court determining whether to adopt or this view of the evidence.

Finally, the Application Note to § 2G1.1 defines "victim" to mean "a person transported, persuaded, induced, enticed, or coerced to engage in, or travel for the purpose of engaging in, a commercial sex act or prohibited sexual conduct, *whether or not he person consented to the commercial sex act or the prohibited sexual conduct."* (emphasis added). The guideline adds up to five levels for any defendant charged with running a prostitution business whether the prostitutes are non-consenting, first-timers who are tricked into working for pimps who steal their money, or are career prostitutes or porn stars who are well paid and have chosen prostitution as a way of life. Indeed, this is the only guideline that blurs the distinction between willing participants and coconspirators.

Mr. Rizzi's "victims" freely chose to engage in commercial sex acts. They purposefully sought out employment through his various websites. Mr. Rizzi owned premium website addresses and the women who wanted to work in this industry desired to work for him and they applied to him from the safety of their homes and readily traveled to the New York City metropolitan area, paying their own way, for the sole purpose of engaging in escorting and prostitution. They worked for a period of time and after returning home, many of the women chose to return for additional jobs through Mr. Rizzi's website. It is fair to assume that many if not most of the women who worked for Mr. Rizzi had been prostitutes long before responding to Mr. Rizzi's internet ads and more than likely, still work as prostitutes today, either independently or with different agencies. In fact the Complaint in this action refers to at least one escort who had worked for Marc Schulman prior to his arrest and then sought out and obtained employment with Mr. Rizzi after Schulman ceased operations. In a case such as this, where the addition of

four levels nearly doubles the defendant's applicable guidelines range – for Criminal History Category I the addition makes the applicable range change from 18 to 24 months to 30 to 37 – a sentence below this guidelines is more than sufficient to promote respect for the law and provide just punishment for the offense.

> **Mr. Rizzi's Criminal History Should Not be Category II Because His 2011 Gambling Offense is "Similar to" the Excluded Offenses Listed In USSG § 4A1.2 and Two Points Should Not be Added Per § 4A1.1(d) Because this Offense is not countable under USSG § 4A1.2 and Thus he Did Not Commit the Instant Offense while under a "Criminal Justice Sentence"**

The Probation Officer makes the following arguments for the addition of three points to Mr. Rizzi's Criminal History calculation. "According to the criminal complaint in the instant matter, on October 21, 2009, the defendant was arrested by the Organized Crime Investigation Division of the New York City Police Department. The defendant was charged by the Queens County District Attorney's office with Enterprise Corruption for his role in a sports gambling ring. The indictment charged that the defendant acted as a "super agent" for the sports gambling ring with approximately 400 bettors placing bets with him." (PSR ¶ 58). Unfortunately, this is simply not true. Annexed to the Declaration of Counsel submitted in connection with this Sentencing Memorandum is the Indictment from that case. That Indictment alleges that "[ ] Michael Rizzi [was a] master-agent[ ] in this operation who had agents under [him]". (*See* Page 45 of Exhibit D.1). The Indictment further alleges that "[a]t various times relevant to this indictment [ ] Michael Rizzi [ ] had master-agent, agent and/or bettor accounts in which bets were accepted." (*Id.* at 46). This is the extent of the Indictment's elaboration on Mr. Rizzi's conduct in connection with this alleged criminal enterprise. There is absolutely no support for the allegation that he was a "super agent" or that he had "approximately 400 bettors placing bets with him."

A closer look at that Indictment actually shows that the defendant's conduct in connection with that matter was actually minor in comparison to the other defendants. That investigation and indictment focused on the activities of an online sports gambling operation orchestrated and operated by Joseph J. Fafone. The "Pattern of Criminal Activity" alleged in the indictment consisted of specified acts of daily activity in unlawful gambling that exceeded $5,000 and thus qualified as Promoting Gambling in the First Degree in violation of New York Penal Law § 225.10(1). The allegedly unlawful acts began on March 12, 2007 and continued until February 5, 2009. The first instance of Mr. Rizzi being involved in the operation is alleged to have occurred on January 28, 2009 – nearly two years after the first act occurred and exactly nine days before the last act occurred. He is the 30th defendant named in that indictment with no other individual lower on the rung of that allegedly criminal enterprise. Mr. Rizzi pleaded guilty to an A Misdemeanor of promoting gambling in the second degree, and was sentenced to a conditional discharge and asked to forfeit approximately $8,021.

The Probation Officer argues that "based on United States v. Morales, 239 F.3d 113 (2d Cir. 2000) and United Stets v. Martinez-Santos, 184 F.3d 196 (2d Cir. 1999), the Probation Department has looked at the seriousness of the defendant's conduct in this local offense, as well as the type of conviction (a class A misdemeanor), and we have deemed that his conduct is more serious tha[n] simple gambling. As such, we have determined that this offense is countable under the guidelines." (PSR ¶ 58). With all due respect, the Probation Department has clearly not "looked at the seriousness of the defendant's conduct in this local offense." It appears that their assessment is based merely upon the allegations contained in the criminal complaint from Mr. Rizzi's instant offense that incorrectly states what was alleged in the indictment against Mr. Rizzi.

When determining the applicable criminal history points to be assessed to a particular defendant USSG § 4A1.1 instructs the Court to add certain points based upon: (a) prior sentences for sentences of imprisonment exceeding one year and one month; (b) prior sentences of imprisonment of at least sixty days that weren't counted under subdivision (a); and, (c) any prior sentence that wasn't counted in either subdivision (a) or (b).  The USSG then goes on to specifically exclude certain enumerated offenses from calculation.  USSG § 4A1.2(c) says "[s]entences for misdemeanor and petty offenses are counted, except as follows: (1) Sentences for the following offenses and offenses similar to them, by whatever name they are known, are counted only if (A) the sentence was a term of probation of more than one year or a term of imprisonment of at least thirty days, or (B) the prior offense was similar to an instant offense." Gambling is a specifically enumerated offense.

In determining whether the crime of conviction is "similar to" a specifically enumerated offense, "the goal of the inquiry is to determine whether the unlisted offense under scrutiny is categorically more serious than the Listed Offenses to which it is being compared." *United States v. DeJesus-Concepcion*, 607 F.3d 303, 304 (2d Cir. 2010) (quoting *United States v. Morales*, 239 F.3d 113, 118 (2d Cir. 2000)).  In determining whether the unlisted offense is categorically more serious than the listed offense, a sentencing court "may consider multiple factors …, including "[1] a comparison of punishments imposed for the listed and unlisted offenses, [2] the perceived seriousness of the offense as indicated by the level of punishment, [3] the elements of the offense, [4] the level of culpability involved, and [5] the degree to which the commission of the offense indicates a likelihood of recurring criminal conduct." *Id.* (quoting *United States v. Martinez-Santos*, 184 F.3d 196, 206 (2d Cir. 1999)).  In addition, a sentencing court "may also

consider any other relevant factor, including "the actual conduct involved and 'the actual penalty imposed.'" *Id.* (quoting *United States v. Sanders*, 205 F.3d 549, 553 (2d Cir. 2000)).

Mr. Rizzi's promoting gambling in the second degree conviction must be afforded the protections of USSG § 4A1.2(c). New York does not have a "simple gambling" offense as the Probation Officer references in the PSR. The gambling offense in New York that carries the lowest penalties is promoting gambling in the second degree – Mr. Rizzi's offense of conviction. As described in *People v. Girodano*, 87 N.Y.2d 441 (1995), the crime of promoting gambling in the second degree is distinguished from the first degree offense in significant ways. Namely, the first degree offense contemplates that the defendant is essentially a bookmaker whereas the second degree offense "imposes misdemeanor liability for the entire spectrum of gambling activity." *Id.*, at 447. The Complaint in this action would have this Court assign the bookmaker moniker to Mr. Rizzi, despite the fact that the Court and the District Attorney's Office determined that his offense was more properly addressed as a misdemeanor "gambling" offense. This Court must reject the Probation Officer's argument to afford Mr. Rizzi one criminal history point for this conviction because his offense of conviction is specifically enumerated in the exceptions located in 4A1.2(c). No further proof is before this Court that Mr. Rizzi engaged in anything other than the enumerated offense of "gambling" as that term is contemplated in the USSG.

The Probation Officer argues that the defendant committed the instant offense while under a criminal justice sentence; specifically, the PSR argues that the defendant was on unsupervised probation with regard to his conviction on May 22, 2012. Therefore per USSG § 4A1.1(d), 2 points are added. (PSR ¶ 60). The Probation Officer's argument fails. Though a sentence of conditional discharge can qualify as a "criminal justice sentence," *see United States*

*v. Labella-Szuba*, 92 F.3d 136, 138 (2d Cir. 1996), the conditional discharge sentence here does not qualify because a "criminal justice sentence" includes only a sentence "*countable under § 4A1.2*." *See*, USSG § 4A1.1 cmt. n.4 (emphasis added).  Because the conditional discharge sentence imposed on Mr. Rizzi for his gambling conviction is not "countable under § 4A1.2," *see supra*, the two point increase under § 4A1.1(d) does not apply.

**B.     Comments and Objections to the Presentence Report**

Mr. Rizzi respectfully objects to and requests that the Court reject and amend the following findings and recommendations of the United States Probation Office listed in its PSR:

1.       ¶ 2 should be amended to correctly state that the forfeiture provision has been outlined in ¶ 115.

2.       The defendant objects to ¶¶ 4 and 5 insomuch as they detail relevant conduct that is not attributable this defendant but rather directly concerns the defendant Marc Schulman.

3.       The defendant objects to ¶ 7 to the extent that it asserts that he was the named registrant of two separate GoDaddy.com shopper IDs.  Mr. Rizzi asserts that he only owned one shopper ID and any allegation to the contrary would be contrary to the available evidence.

4.       The defendant objects to ¶ 8 to the extent that it asserts that occasionally there were topless models associated with his escort websites.

5.       The defendant objects to those portions of ¶¶ 14 and 18 to 56 that relate to the appropriate sentence and the applicable enhancements.  These objections are more fully detailed within this memorandum in aid of sentencing.

6.       The defendant objects to those portions of ¶¶ 57 to 61 that relate to the proper application of USSG 4A1.1 as relates to his Queens County conviction for gambling as more fully detailed within this memorandum in aid of sentencing.

### C.    Booker and 18 U.S.C. § 3553(a) Factors

The Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), now requires district courts to consider both the Sentencing Guidelines and all of the factors contained in 18 U.S.C. § 3553(a) when determining a criminal defendant's ultimate sentence.  The Supreme Court has firmly instructed that sentencing courts "may not presume that the Guidelines range is reasonable." *Gall v. United States*, 552 U.S. 38, 49-50 (2007)(citing *Rita v. United States*, 551 U.S. 338, 351 (2007); accord *Nelson v. United States*, 555 U.S. 350 (2009)("Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable").  Rather, a sentencing court must make an "individualized assessment based on the facts presented."  *Gall*, 552 U.S. at 50.  Above all, a court's final determination of a sentence must reflect "§ 3553(a)'s overarching instruction to 'impose a sentence sufficient, but not greater than necessary' to accomplish the sentencing goals advanced in 3553(a)(2)," namely, retribution, deterrence, incapacitation, and rehabilitation.  *See Kimbrough v. United States,* 552 U.S. 85, 111 (2007).

*Rita* made clear, and *Kimbrough* affirmed, that in making these individual assessments, sentencing courts are free to disagree with the guidelines' recommended sentence in any particular case, and may impose a different sentence based on a contrary view of what is appropriate under § 3553(a).  This includes the freedom to disagree with "policy decisions" of Congress or the Sentencing Commission that are contained in the guidelines.  As the Supreme Court noted, "[a]s far as the law is concerned, the judge could disregard the Guidelines …" *Rita*, 551 U.S. at 353.  As the Court put it in *Rita*,

> The upshot is that sentencing statutes envision both the sentencing judge and the Commission carrying out the same basic 3553(a) objectives.

*Id.* at 348.

Moreover, in *Kimbrough*, the Supreme Court effectively acknowledged that not all guidelines are equal. While some "exemplify the Commission's exercise of its characteristic institutional role," others do not. *Kimbrough*, 552 U.S. at 109. Mr. Rizzi submits that this is the case with USSG § 2G1.1(d)(1) which provides that "[i]f the offense involved more than one victim, Chapter Three, Part D, (Multiple Counts) shall be applied as if the promoting of a commercial sex act or prohibited sexual conduct in respect to each victim had been contained in a separate count of conviction."

Thus, this Court must begin its analysis by correctly calculating the advisory sentencing range, but it is then free, in light of the other statutory sentencing factors, to impose an entirely different sentence – one which is "sufficient, but not greater than necessary to comply with" the statutory goals of sentencing. *Rita*, 551 U.S. at 350-51.

The Court must impose a sentence "sufficient, but not greater than necessary," to comply with the purposes set forth in § 3553(a) which are "the need for the sentence imposed –

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

18 U.S.C. § 3553(a)(2). In "determining the particular sentence to be imposed," the Court must consider the nature and circumstances of the offense and the history and characteristics of the defendant, the need to avoid unwarranted disparities, and the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a)(1)-(7).

## I.     The Nature and Circumstances of the Offense

Michael Rizzi did not invent the world of escorts and prostitution, but he is of course not blameless. It is a world that has existed in one form or another for centuries; it is a profession

that has enjoyed moments of legal status with popular acceptance and decades of disdain, scorn, and hatred during periods of prohibition.  In the English tradition, this prohibition can be traced back most colorfully to the April 14, 1546 proclamation of King Henry VIII "Ordering London Brothels Closed" where the

> King's most excellent majesty, considering how by toleration of such dissolute and miserable persons … have been suffered to dwell beside London and elsewhere in common, open places called the stews, and there without punishment or correction exercise their abominable and detestable sin, there hat of late increased and grown such enormities as not only provoke instantly anger and wrath of Almighty God, but also engender such corruption among the people…[the King thus] hath by advise of his counsel thought requisite utterly to extinct such abominable license and clearly take away all occasion of the same.

*See*, Paul L. Hughes and James F. Larkin, *Tudor Royal Proclamations*, 3 Vols. (New Haven: Yale University Press, 1964-9), I.365.   It is within this world that Michael Rizzi sought to make a place for himself and therefore in and around 2012 he began to research and investigate the possibility of operating a lawful escort business.  He began to explore the opportunities that were being presented by search engine optimization and became aware of huge profits centered around an aggressively marketed online presence in the escort business.  Admittedly he failed in his attempt to run a lawful escort business – had he not, this Court would not have the opportunity to decide what is an appropriate sentence for Mr. Rizzi.

His letter to this Court indicates that it was his "intention to start a legal escort companionship service."  *See*, Exhibit A, page 25.  He did not "use 'shell corporations' nor did [he] try to hide [his] identity or nature of the business to banks or merchant processing companies."  *Id.*  He reported all of the income made through the escort business and reported all escort subcontractors' earnings via 1099 to the Internal Revenue Service.  He paid taxes on all the profits of the business.  The escorts that worked for him sought employment with him after finding his online presence and actively pursued jobs with him.  He hired his escorts with written

contracts prohibiting unlawful activities, and states that he "always instructed [his escorts] never to provide service to any clients asking for anything illegal and to notify [him] so [he] could 'black list' their phone numbers." *Id*.

  The heart of Mr. Rizzi's business involved operating a number of websites that advertised escort services. Through search engine optimization, his websites obtained an incredible amount of popularity and business began to blossom. His operation then became too large for his initial desires to maintain a lawful escort and companionship business and at a certain point he decided to make the fateful decision to continue his business despite its unlawfulness. He elaborates that "I, honestly, was never aware of specifically what went on between escorts and clients behind closed doors. Appointments were made for dinner dates, movies or a show, parties and often simply for companionship; very often never ending up behind a closed door." He mentions in his letter to this Court that there were specific occasions early on in his business where he learned of sexual contact between the escorts and clients and at such time he "cancelled the model's contract and let her go."

  Mr. Rizzi's business catered to high paying customers who sought discrete encounters with relatively sophisticated women. The services provided by the women who worked for Mr. Rizzi were consensual. As mentioned, the women searched out Mr. Rizzi's operation and willingly traveled from locations throughout the country to work for his escort business, paying their own travel expenses to get to the New York City area. Because the services they performed were very lucrative, many of these women chose to return and work for Mr. Rizzi on a number of subsequent occasions.

The financial gain to be made in this business and the overwhelming popularity of his particular operation made it difficult for the defendant to maintain his initial goals of maintaining a lawful

escort and companionship business and he "turned a blind eye to" the sexual contact between his escorts and clients. The defendant references a point where he attempted to reduce his advertising in order to more fully get "a better grip on the business", meaning return to the lawful practices he originally thought he could maintain. Once the money became too big to pass up, he willingly went along with the prostitution business and his guilty plea acknowledges his voluntary and knowing involvement in this illicit operation.

The defendant acknowledges the PSR's basic description of the workings of his escort business. He operated several websites that advertised numerous women who were available for escort services in the New York City area, he maintained a call center that accepted calls on behalf of the business and was often staffed by one of two women – referred to as "Jane Doe #1" and "Jane Doe #2" in the PSR. When calls came into the business, either the defendant or one of the two women would answer the call, see which escort was available to attend to the call, and provide the escort with the logistical information to make contact with the customer. Some of the customers paid in cash which was deposited in the business' operating accounts; more often the customers paid for the escort services with credit cards that were processed through the defendant's business BJM. The defendant instructed the escorts to obtain a copy of the customer's identification as well as an imprint of the credit card so as to avoid fraudulent transactions. At the end of the sessions, the defendant would obtain the payment slips and distribute the proceeds. The defendant maintains that 20% of the overall payment would be directly returned to the credit card processing company, 40% of the overall payment would be paid directly to the escort, and 40% would be retained by the defendant from which he would pay the expenses associated with the operation and keep the remainder for himself as profits.

## II.     History and Characteristics of the Defendant

Submitted herewith are numerous letters of support that have been drafted to assist the Court.  Hopefully, these materials will aid the Court in taking the measure of the man appearing for a sentencing that will have profound and lasting effects on him, his family, and his community even in the best of circumstances.  Mr. Rizzi is not a hardened criminal.  He is a man who, despite his mistakes and shortcomings, has expressed extraordinary acceptance of responsibility by pleading guilty early in this case as well as by personally speaking with his close family and friends to seek their understanding and forgiveness for his behaviors.

Mr. Rizzi, age 46, was born in 1971 in Brooklyn, New York to the marital union of James Rizzi and Anna Cacace.  He has one sibling, an older brother James Rizzi, Jr.  He has been married for the past fourteen years to his wife Jill and has two children, Brooke and Michael, Jr.  His family is aware and supportive regarding his arrest and conviction.  Mr. Rizzi enjoys the love and support of his family.  He is a supportive father and wants to be present for the continued upbringing of his two children.

The requirement that a court impose a "sufficient, but not greater than necessary" sentence to achieve those goals sets a limit on the sentence that a court may impose. As the Second Circuit explained in *United States v. Dorvee*, 616 F.3d 174, 182 (2d Cir. 2010),

> [e]ven where a district court has properly calculated the Guidelines, it may not presume that a Guidelines sentence is reasonable for any particular defendant, and accordingly, must conduct its own independent review of the §3553(a) sentencing factors. *See [United States v.] Cavera,* 550 F.3d [180,] 189 [(2d Cir. 2008) (*en banc*)].

Under 18 U.S.C. § 3661, "no limitation shall be placed on the information concerning the background, character, and conduct of [the defendant] which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

Mr. Rizzi is keenly aware of the seriousness of the crimes to which he pled guilty. He recognizes that he is facing a lengthy period of supervision and potential incarceration. Mr. Rizzi hopes to play a useful and supportive role in his children's lives, be gainfully employed, and able to financially assist his family. An "individual assessment" of Mr. Rizzi takes into account his physical condition, prior good acts, and the impact any potential incarceration would have on his family.

        1.       <u>Mr. Rizzi's Physical Condition</u>

In 1995 the defendant injured his back while employed as a New York City Police Officer. Specifically, he was guarding a hospitalized prisoner at Coney Island Hospital in Brooklyn, New York. The prisoner was a larger individual, and the police department had three officers guarding the prisoner during the night, but they left Mr. Rizzi guarding the prisoner on his own without any additional officers to assist him. Mr. Rizzi had gone out of the prisoner's room to ask for the prisoner's medication, and the prisoner broke free and attempted to escape. Mr. Rizzi and the prisoner engaged in a four minute fight, and the defendant attempted to subdue the prisoner by jumping on the prisoner's back. The prisoner jumped up in the air and he landed on a metal cart with Mr. Rizzi on his back.

Following this incident, Mr. Rizzi suffered numbness in his legs and extreme pain in his back. The defendant was sent for physical therapy and received cortisone shots, but he continued to experience the numbness and pain. He then went to a neurosurgeon and learned that he had two discs touching his sciatic nerve. In 1996 he underwent surgery at the Hospital for Special Surgery in New York, New York. The defendant awoke from the surgery and the numbness was gone; however, he continued to experience pain in his back.

He experiences constant pain in his back.  He receives weekly adjustments which include heat and electronic stimulations from his chiropractor, Dr. Eric Workin in Staten Island, New York.  He has been prescribed Ibuprofen, Naproxen, and Percocet for the pain.  He tries so stay away from these medications though and typically takes Advil to treat the pain.   Mr. Rizzi submits that incarceration would be unusually problematic and costly for him due to his medical condition.

Because of these ailments, defendant asks that the Court, as a factor in determining his sentence, to consider his health condition.  *See United States v. Rioux*, 97 F.3d at 663 (2d Cir. 1996) (upholding district court's conclusion that, in combination, defendant's medical condition and charitable and civic good deeds warranted downward departure); *United States v. Martin*, 3363 F. 3d 24 (1st Cir. 2004) (appellate court affirmed departure where a defendant suffered Crohn's disease, noting that Crohn's disease, a malady of the small intestine, made defendant unusually susceptible to harm in prison because of risk of serious infection); *United States v. McFarlin*, 535 F.3d 808(8th Cir. 2008) (appellate court affirmed a departure for a serious heart condition and related problems); *United States v. Ghannam*, 899 F.2d 327 (4th Cir. 1990) (appellate court affirmed departure for debilitating effects of cancer); *United States v. Gee*, 226 F.3d 885 (7th Cir. 2000) (affirming departure where the district court reviewed medical record, watched deposition of defendant's cardiologist and listened to in court testimony of both defendant and his mental health therapist).

### 2. Prior Good Acts

The Guidelines provide that public service and "prior good works," as well as military, civic, and charitable service, "are not ordinarily relevant in determining whether a departure is warranted."  *See* USSG 5H1.11.  Nonetheless, as with respect to all such discouraged grounds,

sentencing judges may properly depart based on a defendant's public service and good works if such circumstances are present to an exceptional degree. *See United States v. Canova*, 412 F.3d 331, 358-59 (2d Cir. 2005) (variance approved where defendant served in Marine Corps for six years, was a volunteer firefighter for seven years, helped deliver three babies, and acted as a Good Samaritan on three distressful occasions in which others present were rendered helpless); *United States v. Huber*, 462 F.3d 945 (8th Cir. 2006) (affirming three level reduction where defendant had loaned money to neighbor and fellow farmers in need, saving farms from foreclosure and helped finance the start up and continuation of businesses in local community); *United States v. Cooper*, 394 F.3d 172 (3d Cir. 2005) (downward departure affirmed for a defendant who organized a youth football team in a depressed urban area, mentored the boys, and paid for one of the boys to go college; these were not detached acts of charity but hands-on personal sacrifices, which must have had a dramatic and positive impact on the lives of others); *United States v. Serafini*, 233 F.3d 758 (3d Cir. 2000) (affirming downward departure where defendant, a state legislator, had engaged in acts of personal kindness and good works that were "above and beyond" customary politics or charitable giving; *United States v. Woods*, 159 F.3d 1132 (8th Cir. 1998) (defendant paid for others to attend a private school, and both had graduated and become productive members of society); *United States v. Jones*, 158 F.3d 492 (10th Cir. 1998) (upholding departure based in part on defendant's long history of community service and his strong support in the community, even among family of the victim).

Here, the defendant submits that the strong support he has received from his community, and the substantial hands-on personal good works he has done, are a basis for sentencing him below the guideline range. Mr. Rizzi's character letters are incredible by any stretch of the word. The letters detail an extraordinarily selfless individual who routinely puts the interests of others

before himself.  The letters are replete with anecdotes of the various writers' time spent with Mr.

Rizzi where he has gone above and beyond to assist those in need.  I call the Court's attention to

the letter of Enrico and Josephine Bruzzese for one of many examples.  The Bruzzese's refer the

Court to the troubles of their 13 year old daughter Julia who was diagnosed with a chronic case

of Lyme disease in 2015 and also developed Guillain-Barre Syndrome, Postural Orthostatic

Tachycardia, and severe autonomic dysfunction.  She "has been unable to walk and has been

wheelchair bound since June, 2015."  The Bruzzese's write that:

> In October 2015, Michael and his wife, Jill, launched and promoted a GoFundMe page that raised a significant amount of money needed for my family to get by and support all of Julia's needs.

> Michael and his family have found a local charity and have arranged for large donations that help pay for Julia's medical expenses and expenses related to helping my family survive up until now.  This has kept my family from homelessness, while finding help for my daughter.  Additionally, through Michael's relentlessness, we have been able to spread awareness about the disease.  Michael and his family have come to our aid financially, logistically, and emotionally; they have lifted us from very difficult times on many occasions.

*See*, Exhibit A, page 17.

Another example of Mr. Rizzi's prior good acts as mentioned throughout the letters is his

compassion and care for the well-being of a dear friend who succumbed to the disease of

alcoholism in 2015.  Several of the letters describe how Mr. Rizzi spent hours with this friend

and devoted emotional and physical support to this friend, despite the fact that some of his own

family had failed to remain by his side.

Finally, there are several letters that detail Mr. Rizzi's prior good acts to the community

through his work as a New York City Police Officer.  The final letter, a commendation from

Commissioner Howard Safir states:

> The Integrity Review Board has informed me of your performance in our fight against corruption.

[ ] Your actions speak very clearly of your commitment to the highest standards of professional conduct.

Please be assured that your faithfulness to your oath of service has earned my appreciation in addition to that of the People of New York whom we serve. Thank you for acting in a way that brings credit and praise to the finest law enforcement agency in the world.

Other letters detail Mr. Rizzi's connection with the community through his role as a police officer and as a former police officer. The letter from Charles Balducci on behalf of NYC Arts Cypher appears emblematic of Mr. Rizzi's community involvement. In that letter, Mr. Balducci describes how Mr. Rizzi has assisted his organization throughout the years in directly communicating with the youth of Staten Island in their interaction with police officers and respect for the law. Mr. Balducci states that he "ha[s] personally witnessed youths telling other youths how to conduct themselves when interacting with Police because of Mikes' words." *See* Exhibit A, page 21.

        3.    <u>Impact on Mr. Rizzi's Family</u>

The PSR and several of the letters in support detail the physical condition of Mr. Rizzi's elderly parents, the financial burden that incarceration would place on his immediate family, and the writers' personal observations of the impact that the defendant has on certain members of his family. The Court should consider the impact that any potential sentence of incarceration would have on Mr. Rizzi's family when deciding the appropriate sentence in this matter.

The defendant's brother indicates:

We have two sick elderly parents that Michael primarily takes care of. My mother Anna is 83 years old and has been recently diagnosed with Chronic Lymphocytic Leukemia, an aggressive form of Leukemia. My father James is 86 years old was diagnosed with Bladder Cancer and has undergone chemotherapy and radiation treatments. One week after the completion of my father's chemotherapy and radiation treatments, he slipped and fell and broke his hip and had to undergo hip surgery. The reason I tell you this is because I want you to

know the extent to which my brother Michael cares for our parents. He takes
them to their medical appointments, and oversees all their medicine and
prescriptions daily and selflessly. Every child should take care of their parents,
but I can tell you, this is a fulltime, with overtime, workload for both of us. And
as I work full time in Manhattan each day, Michael does the bulk of it.

*See*, Exhibit A, page 13.

The defendant's wife further describes the following:

Michael is a strong and honorable man who has admitted to making a less than
honorable mistake. This however, does not define the person he is. Michael is a
very honorable, dependable and caring man. He is honorable in the father he is to
his children, the husband he is to me, the son and brother he is to our families, the
friend he is and the charitable man he is to the community. We all depend on
Michael in many different ways and he always does his best to do what he can to
be there for us all. The utmost important people in his life are our children.
Together, we teach them to be respectful towards God, themselves and others and
to be family-oriented young people by spending time together, such as at Mass,
through charitable works & daily meals. Through our actions & commitments,
we do our best to teach them the value of family, friends and community. Among
other things, Michael volunteers his time to assist in coaching our son's football
team whenever possible. He is responsible for the care of both of his elderly &
ailing parents and helps to support me in the effort to care for mine as well. I also
have a brother who is mentally ill who often looks to Mike as someone who he
can trust when experiencing episodes of delusion & paranoia. Several times in
the past, Mike has been the only one who was able to calm & convince him to
surrender himself to hospitalization. [ ]

On behalf of our entire family, I ask for leniency in his sentencing. In his
absence, I fear our children and I will suffer tremendously emotionally,
psychologically & financially. The loss of his daily presence coupled with the
possibility of having to separate from their school friends due to the effects
Mike's absence will have on our financial situation, will cause Brooke and
Michael excessive & extreme pain and suffering.

*Id.*, Page 11.

The defendant's family circumstances and ties are a factor justifying a non-guideline

sentence. *See e.g. United States v. Galante*, 111 F.3d 1029, 1035 (2d Cir. 1997) ("the families of

defendants are the intended beneficiaries of downward departure on the ground of extraordinary

circumstances relating to family responsibilities"); *United States v. Johnson*, 964 F.2d 124, 129

(2d Cir. 1992) (the potential for imprisonment to effect the destruction of an otherwise strong family unit can be a basis for a judge's discretionary departure from the range set forth in the guidelines); and *United States v. Alba*, 933 F.2d 1117, 1122 (2d Cir. 1991) (same). Here, the intended beneficiaries are his two children, his wife, his elderly parents, and his wife's elderly parents and brother. So, sending Mr. Rizzi to prison for a lengthy period of time would not only hurt these member of his family who rely on his emotional support but also undercut the financial wellbeing of his minor children, since he is basically the sole bread-winner for his family.

Understanding and acknowledging the background of Mr. Rizzi is critical because such knowledge assists the Court in finding a sentence that is sufficient but not greater than necessary to reach the sentencing goals of Congress. Without such knowledge regarding the factors that influenced a defendant towards the commission of the offense, the defendant is left to the mercy of mathematical formulas that arrive at terms of incarceration with zero empirical relationship to either punishment or the causes that brought the offender before the court for sentencing. *See United States v. Diaz*, 1:11-cr-00821 (JG) 2013WL32243, at 4-11 (E.D.N.Y. Jan. 28, 2013).

Naturally, Mr. Rizzi's conduct calls into question whether he would avoid and remain free of future criminal conduct. However, the felonious conviction as well as the personal embarrassment, anxiety, and depression that he has suffered and along with his requested sentence of 12 months of home confinement and a period of supervised release would certainly serve as a meaningful period of time for penance and reflection in that regard. The road to redemption for Mr. Rizzi will be long and filled with many challenges. Recognition and early acceptance of responsibility, along with his positive adjustment to pre-trial supervision are steps in that direction. *C.f. Skipper v. South Carolina*, 476 U.S. 1 (1986) (positive prison adjustment is

a sentencing mitigation factor); and *Gall v. United States*, 552 U.S. 38 (2007) (court may consider post arrest conduct, along with other factors, to impose a sentence at variance with the Guidelines).

### The Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment, and Avoid Unwarranted Disparities

Mr. Rizzi submits that a sentence in the range of 12 months of home confinement plus a period of supervised release is sufficient to reflect the seriousness of the offense, promote respect for the law and provide just punishment. A sentence within this range is also consistent with the sentences received by defendants in several recent cases who have pled guilty to money laundering charges related to escort agencies. The head of the Emperors Club VIP escort service in New York (made famous by Elliot Spitzer's involvement as one of its clients) received a sentence of 30 months despite running an international prostitution business for four years that charged three day rates of as much as $50,000 for its prostitutes. *See United States v. Mark Brenner*, Case No. 1:08-cr-00533 (S.D.N.Y.). The head of Miami Companions received a sentence of fourteen months after admitting to running an escort service that operated throughout the United States, listed over 30,000 clients, booked more than 100 appointments a day, set up a call center in Panama to lower costs and avoid detection and on occasion was involved in the transportation of illegal aliens for the purpose of prostitution. *See United States v. Gregory Carr*, 2:10-cr-20400 (E.D. Mich. 2011)[1]. An enormous escort operation prosecuted in the Middle District of Pennsylvania resulted in the forfeiture of 4,900,000 in cash and the domain name escorts.com, a fine of 1,500,000 and the imposition of 18 months probation, which was permitted to proceed against the corporate identities only despite the large scale of the operation and the

---

[1] In *Brenner* and *Carr*, the Government did not seek and the courts did not impose the five-level upward adjustment for transporting more than five women.

explicitness of the advertised prostitution that occurred through the business' website. *See United States v. R.S. Dufffy, Inc. and National A-1 Advertising, Inc.*, 4:11-cr-00305 (M.D. Pa 2011). The head of Classy DC Escorts received a sentence of fifty-one months and forfeiture of $1.6 Million, after admitting to running an escort service that actively recruited prostitutes from throughout the United States and Canada, employed over 100 prostitutes and received over $4 million in cash, opened bank accounts under false names and deposited proceeds from the prostitution business into the accounts, and utilized violence to intimidate others from opening a rival prostitution business in the area. *See United States v. Kuraye Akuiyibo*, 1:12-cr-00038 (E.D. Va 2012). Finally, and most importantly, in the companion case that preceded Mr. Rizzi's prosecution, the head of Pure Platinum Models, Marc Schulman, was sentenced to one year and one day after his admission to operating an escort business that generated revenues in excess of $1 Million. *See United States v. Marc Schulman*, 1:15-cr-00415 (E.D.N.Y. 2015). The court, Hon. Edward R. Korman, found that a sentence outside of the Advisory Guideline System was appropriate due to the § 3553(a) factors. The court's justification for the sentence was that "[t]he court departs because of defts family circumstances, the fact that the deft merely provided to 'women of the night' who were voluntarily pursuing their occupation transportation and there are no aggravating circumstances."

Guidelines Calculation

The defendant submits that the appropriate guidelines calculation is as follows: (i) fourteen points are to be added as the base offense level pursuant to USSG § 2G1.1(a)(2); (ii) two levels should be added to the base offense level pursuant to USSG § 2S1.1(b)(2)(B) because the offense involved a conviction under § 1956. The defendant should be afforded a three-level reduction based upon the his timely acceptance of responsibility. Thus, the offense level should

be calculated to be 13.  As argued *supra*, the defendant maintains that he is properly sentenced within Criminal History Category I – according with an Advisory Guideline range of imprisonment for a period of between 12 and 18 months.

Mr. Rizzi submits that his physical condition, prior good acts, and the potential impact on his family make a sentence 12 months home confinement with a period of supervised release does not create an unwarranted disparity with other similar defendants and is sufficient to promote respect for the law and provide just punishment.

**D.    Conclusion**

I respectfully urge the court to vary from the advisory Guidelines range for the 18 U.S.C. § 3553(a) factors set forth in this memorandum and impose a sentence of 12 months home confinement with a period of supervised release.  That is a significant life-changing penalty that amply punishes Mr. Rizzi for his offense conduct, maintains and encourages respect for the administration of justice, and serves as individual and general deterrents.  It is, in short, a sufficient, but not greater than necessary sentence.

Dated:        New York, New York
              March 27, 2017

                              Respectfully submitted,

                              /s

                              _____
                              Javier A. Solano, Esq.
                              Law Offices of Javier A. Solano, PLLC
                              350 Fifth Avenue, Suite 5900
                              New York, New York 10118

                              212.714.6600 (telephone)

## DECLARATION OF SERVICE

Michael P. Kushner, declares under penalty of perjury and pursuant to 28 U.S.C.

§ 1746, that the following is true and correct:

On March 27, 2017, I served the annexed Memorandum in Aid of Sentencing and

the Declaration of Counsel, along with its exhibits on:

A.U.S.A. Jennifer M. Sasso
United States Attorney's Office
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

[X]    BY ELECTRONIC CASE FILING
[X]    BY FIRST CLASS MAIL
[ ]    BY HAND DELIVERY
[ ]    BY FACSIMILE WITH PERMISSION

Certain portions of the exhibits to the Declaration of Counsel are protected materials and have

only been served by first class mail.  Those portions of the exhibits are identified in the within

papers.

Dated: Brooklyn, New York
       March 27, 2017

/s
_____
Michael P. Kushner, Esq.
16 Court Street, Suite 2901
Brooklyn, New York 11241
718.504.1440