

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

TJS:JMS  271 Cadman Plaza East, 4th Floor
F.#2014R01020  *Brooklyn, New York  11201*

April 10, 2017

By ECF

The Honorable Carol Bagley Amon
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

        Re:    United States v. Michael Rizzi
                   Criminal Docket Number 16-CR-342 (CBA)

Dear Judge Amon:

      The government respectfully submits this letter in advance of sentencing in the above-captioned case, which is scheduled for April 26, 2017.  For the reasons set forth below, the government respectfully requests that the Court impose a sentence within the applicable Guidelines range as determined by the Court.

I.      Background

      The defendant Michael Rizzi, also known as "Bruce," is a retired New York City Police Department officer and was the owner and operator of BJM Consulting ("BJM") d/b/a Manhattan Stakes and Entertainment, a prostitution enterprise.  On October 5, 2016, the defendant pled guilty to one count of money laundering conspiracy in violation of 18 U.S.C. § 1956, which charges arose out of the defendant's operation of BJM.  BJM was a spin-off from a predecessor prostitution enterprise, Pure Platinum Models, previously run by Marc Schulman.  Presentence Investigation Report ("PSR") ¶ 6.  In early 2013, several of Schulman's employees were arrested pertaining to their role in Pure Platinum Models.  On July 29, 2014, Schulman was arrested and charged with violations of 18 U.S.C. § 1956 for laundering more than $1,000,000.00 relating to his prostitution businesses between June 2010 and July 2012.  Schulman subsequently pled guilty to money laundering charges and was principally sentenced to one year and one day imprisonment, in the Eastern District of New York.  United States v. Schulman, No. 14-CR-415 (ERK) (E.D.N.Y. Oct. 9, 2015).

      By June 2013, just months after the arrest of Schulman's employees, the defendant Michael Rizzi had effectively taken control of Schulman's prostitution enterprise,

under the moniker of "BJM."  PSR ¶¶ 5-9.  The defendant advertised the services of the enterprise's escorts on various websites (many of which had previously been used by Schulman) including nycescortsnyc.com, janeblow.com, lushplaymates.com, and eliteescortsnyc.com, among other similar websites of which he was the named registrant.  Id. ¶ 7.  Rizzi employed dozens of female escorts who met clients for dates in and around New York City, New Jersey, even abroad, and regularly engaged in sexual activity as part of their paid-for services.  Id. ¶ 12.  In connection with the investigation, law enforcement interviewed at least five female escorts who were employed by BJM during the relevant period.  Id. ¶ 12.  Each of these escorts stated that they engaged in sexual conduct with clients in exchange for money during the dates arranged by BJM, although sexual activity did not necessarily occur at each and every date.  Id.  Escorts typically charged between $400 and $2,000 per hour for these services.  Id.  Several escorts indicated that they were dispatched to overnight or weekend dates with clients, and paid tens of thousands of dollars.  Many of the escorts interviewed by law enforcement indicated that they provided sexual services to the defendant on many occasions, after each of which the defendant left them several hundred dollars or more.

In addition to the female escorts, BJM employed at least three females who worked as phone bookers that set up appointments and dispatched the prostitutes.  PSR ¶ 9.  Customer payments for dates were provided either in cash or by credit card.  Id. ¶ 12.  The defendant also employed two to three "drivers" who were dispatched to take the escorts to client bookings, to pick up escorts after their appointments, and specifically to pick up the completed credit card slips or cash payments at the end of the appointments.  See id. ¶ 13.  Between approximately October 2012 and May 2016, BJM received over $2 million in credit card payments, reflecting only a portion of the company's total proceeds.  Id. ¶ 14.  During the course of running BJM, the defendant had at least five employees on his payroll, operated via an automated Payroll system.

II.     The Presentence Investigation Report and Sentencing Guidelines

The government calculated the following Guidelines estimate in the defendant's plea agreement:

|  | |
|---|---|
| Base Offense Level<br>(U.S.S.G. §2S1.1(a)(1); 2G1.1(a)(2)) | 14 |
| Plus:   Offense involving 5 or more victims<br>(U.S.S.G. §2S1.1(d)(1); 3D1.4) | +5 |

|   |   |
|---|---|
| Plus: Organizer or leader of criminal activity that involved five or more participants (U.S.S.G. §3B1.1(c)) | +4 |
| Plus: Conviction under § 1956 (U.S.S.G. §2S1.1(b)(2)(B)) | +2 |
| Minus: Acceptance of Responsibility (U.S.S.G. § 3E1.1(a), U.S.S.G. § 3E1.1(b)) | -3 |
| Adjusted Offense Level: | <u>22</u> |

This level carries a range of imprisonment of 41 – 51 months, assuming that the defendant falls within Criminal History Category I. Court Ex. 1. The defendant stipulated agreement to the base offense level of 14, as well as the two point enhancement under U.S.S.G. § 2S1.1(b)(2)(B) and a two point enhancement under U.S.S.G. § 3B1.1(c). Id. Specifically, he stipulated agreement to a leadership enhancement, at a 2-point degree rather than a 4-point degree.

Probation calculated the Guidelines as per each victim, agreeing that the base offense level is 14, that a 2 point enhancement applies under U.S.S.G. § 2S1.1(b)(2)(B), and also applying a two point enhancement under U.S.S.G. § 3B1.1(c). PSR ¶¶ 19-48. This yielded a base offense level of 18 for each victim, ultimately resulting in a combined adjusted offense level of 22. Id. ¶¶ 50-52. With a three point reduction for acceptance of responsibility, Probation calculated a total offense level of 19. PSR ¶¶ 50-56. Probation next determined that the defendant has a criminal history score of 3, placing him in Criminal History Category II. Id. ¶¶ 58-61. Probation thus calculated the defendant's Guidelines range as 33 months to 41 months. Id. ¶ 103.

The primary difference in Probation's calculation and that of the government is the treatment of the victims and the leadership enhancement. Probation has given a two-point leadership enhancement as per each victim, and has treated each victim in separate counts. The government maintains its approach to the enterprise, with a four-point leadership enhancement and an aggregated approach to the victims involved.

This approach was employed in United States v. Mi Sun Cho, where the defendant was convicted of sex trafficking in violation of Title 18, United States Code, Sections 2241 and 2242. See United States v. Mi Sun Cho, 713 F.3d 716, 722 (2d Cir. 2013) (citing United States v. Zichettelo, 208 F.3d 72, 107 (2d Cir. 2000)) (A "defendant may be subject to a four-level enhancement even if the defendant managed only one other participant.") In finding that a four-level leadership enhancement was appropriate, the district court in that case cited evidence that "six or seven prostitutes were provided by the defendant to brothels," and the defendant employed many taxi drivers for transportation. Mi Sun Cho, 713 F.3d 716, 722-23. The Second Circuit upheld the application of the four-level

3

leadership enhancement, noting that such evidence "amply" supported "the district court's findings that Cho had a 'leadership role in the conspiracy and that the conspiracy was extensive.'" Id.

III. Argument

The government respectfully submits that a custodial, Guidelines sentence is appropriate in this case.

On March 27, 2017, the defendant filed a sentencing memorandum requesting a non-custodial sentence. In the memorandum, the defendant makes several challenges to Probation's calculations of the Guidelines.

First, the defendant disagrees with the two level upward adjustment for an organizing role in criminal activity, as per U.S.S.G. § 3B1.1(c). Def. Mem. at 2. Determining whether a defendant was an organizer or leader of criminal activity, as relevant to U.S.S.G. § 3B1.1(c), the court should examine "the degree of discretion exercised by him, the nature and degree of his participation in planning or organizing the offense, and the degree of control and authority exercised over the other members of the conspiracy." United States v. Si Lu Tian, 339 F.3d 143, 157 (2d Cir. 2003). It is undisputed that the defendant owned BJM, employed at least five (non-escort) individuals who were on his automated payroll, and that all of the corporate registration and financial information was in the defendant's name. Specifically, he employed three telephone operators responsible for booking jobs, two drivers, and another woman who worked as both and escort and a telephone operator. The defendant had all of the advertising websites registered to him, and all of the client payment deposits and transactions running through merchant accounts and bank accounts in his name or his corporation's accounts. The defendant himself drove escorts to and from dates; picked up credit card slips and cash from escorts; hired and retained and paid the appointment bookers and drivers; and had substantial control over the entire prostitution enterprise. Direct funds from BJM clients were traceable from clients to the defendant's corporate and personal accounts, and finally into financing the defendant's vacation home in Florida. He had substantial financial and operational control over this enterprise. This certainly warrants the upward adjustment for leadership of the enterprise.

The defendant goes so far as to claim that, regarding the nature of the offense, it was his original "intention to start a legal escort companionship service." Def. Mem. at 15. This assertion is not only unsupported by the facts of the case – it is a clear shirking of responsibility and far from acceptance thereof) by the defendant. The Government became aware of the defendant's business, BJM, due to its many connections to a previously running prostitution company, Pure Platinum Models, a company in operating with illegal prostitution since 2009. PSR ¶ 6. The overlap is not coincidental: the client base and websites were the same; the escorts and several employees were the same; the corporate addresses and billing schemes were the same. The defendant simply added new window dressing, the guise of "BJM," to evade detection. The escorts and clients interviewed by law

4

enforcement during the investigation indicated that it was clear they should keep a clean outer appearance – not to expressly discuss sexual services over the phone or email. However, they indicated that everyone knew that this was a prostitution business – escorts who did not perform sexual acts and received complaints would not receive new client bookings. The defendant ensured that clients were billed by "Manhattan Stakes & Entertainment" or "BJM" instead of something elicit. Clients and a phone operator interviewed by law enforcement indicated that if a client called and made an explicit sexual comment, phone bookers hung up on them; but the same client could call back using the same phone number just seconds later, and made no express mentions to sex, an escort would be dispatched to them immediately. The defendant knew exactly what he was operating, and so did every client, escort and employee.

What is most significant, the defendant took the mantle of operations directly from Marc Schulman around the time that Schulman's employees were arrested for participating in a prostitution enterprise. The defendant then proceeded to operate the prostitution business as BJM during the time that Schulman was arrested and charged in the Eastern District of New York for laundering proceeds of a prostitution enterprise. The defendant had full knowledge of what he was taking on, and flew in the face of the law with intention.

Indeed, as a former law enforcement officer, the defendant is well aware of the letter of the law – it is clear from his conduct that he attempted to evade the detection of law enforcement. However, the defendant's arguments and efforts fail when he himself was soliciting the services of the prostitutes he employed. The defendant, on more than one occasion, with more than one escort, sought sexual services (albeit consensual), and typically paid each escort $500 or more for those services. The facts belie the defendant's contentions.

For several reasons, the defendant also contests the employment of at least five individuals or the use of the multiple "victim" enhancement. The defendant specifically contests the term "victim" because, he argues, the escorts "freely chose" to participate and "many if not most of the women who worked for Mr. Rizzi had been prostitutes long before" working for BJM. Id. at 7. The Application Notes for U.S.S.G. § 2G1.1 make it clear that a "victim" includes someone "whether or not the person consented to the commercial sex act." Therefore, whether or not the escorts "freely chose" to participate is not relevant to the defendant's conduct. Whether the women performed sex work before or after they worked for Pure Platinum has no bearing on the sentencing issues under consideration. The facts in this investigation indicated that the defendant employed dozens of women, dispatching them at hourly rates to perform commercial sex acts. The defendant advertised them online, with photographs and sexualized content; he himself drove them to and from dates and employed their services. Whether the defendant believes they were "victims" is of no import here.

5

## IV. Guidelines and 3553(a) Factors

A custodial sentence is warranted in this case in order to "reflect the seriousness," of the defendant's conduct, to "provide just punishment for the offense," and "to afford adequate deterrence of criminal conduct." 18 U.S.C. § 3553(a)(2).

The government determined that, for the reasons elaborated above, the defendant's conduct warrants a Guidelines sentence under the government's calculation of the Guidelines. The four-point leadership enhancement and corresponding range of imprisonment most embodies the defendant's conduct as the owner and operator of a multi-million-dollar prostitution enterprise. The government agrees that there were no unwilling minor victims, but urges the Court to consider the volume of individuals who were ready to be dispatched at the defendant's call, poised to bring in thousands of dollars in just a few short hours, to the defendant's benefit.

Critically, a 41 to 51 month imprisonment period would best deter the defendant and those inclined to follow his flagrant disregard for the law. The defendant was clearly undeterred by the arrest of the Pure Platinum Models employees, undeterred by the arrest of Marc Schulman, and even undeterred by Schulman's custodial sentence of one year imprisonment. The defendant's sentence should adequately deter him and future criminals from making participation in illegal activity so casual. During this endeavor, the defendant operated a company that intentionally impacted public safety and he exploited others for his own benefit, raking in over $2 million in credit card transactions alone, not to mention the amount of cash he collected. His sentence should reflect the seriousness of these actions.

In sum, for the reasons set forth above, the government submits that a Guidelines sentence is appropriate in this case.

Respectfully Submitted,

BRIDGET M. ROHDE
Acting United States Attorney

By:   /s/ Jennifer M. Sasso
Jennifer M. Sasso
Assistant U.S. Attorney
(718) 254-6402

cc: Clerk of Court (via ECF)
Javier Solano & Michael P. Kushner, Esq. (via ECF)
Senior U.S. Probation Officer Patricia Sullivan (via E-mail)